IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **ANDREW KATRINECZ and** | § | |
| **DAVID BYRD,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CASE NO. 1:12-CV-00235-LY** |
| | § | |
| **MOTOROLA MOBILITY LLC** | § | |
| **Defendant.** | § | |

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
MOTOROLA'S MOTION TO EXCLUDE
DAMAGES OPINIONS OF EXPERT DANIEL LINDSAY**

## I. INTRODUCTION

Motorola's motion to exclude Mr. Lindsay's damages opinions (Dkt. 187) is based upon a fundamental misconception that he applied the Entire Market Value Rule (the "EMVR"). He did not. After considering myriad circumstances and parties' respective positions at the hypothetical negotiation, and conducting a detailed *Georgia-Pacific* analysis of all attendant factors, Mr. Lindsay concluded they would have agreed on running royalty structure. In line with the Federal Circuit's recent instructions in *VirnetX*, Lindsay apportioned the royalty base down to a reasonable estimate of the value of the '872 patented invention to "tie proof of damages to the claimed invention's footprint in the market place." 767 F.3d 1308, 1326 (Fed. Cir. 2014) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)). Mr. Lindsay's opinion is not based upon total revenue for the infringing products.

Motorola's own damages expert, Ms. Kindler, undermines its challenge of Mr. Lindsay's apportionment analysis. To properly apportion the royalty base to reflect the value of the patented invention, Mr. Lindsay relies upon industrial design expert Justin Petro. Mr. Petro conducted an in-depth analysis of the features, consumer behavior, and market presence of the accused products, relying upon Motorola's own survey data, to conclude that 17-25% of the value of the infringing handsets is attributable to the '872 patent. Ms. Kindler recently testified that Mr. Petro's methodology is the "common" way to determine "the features that drive consumer demand for the accused products." Exhibit B, Kindler Depo. at 287:11-19 (confirming feature analyses are "common" in patent infringement cases).[1] Indeed, in a prior case involving

---

[1] Ms. Kindler's testimony highlights the erroneous bases for Motorola's *Daubert* challenge to the challenged admissibility of Mr. Petro's opinions as well.

the same Motorola products, Motorola's own damages expert, Michael Wagner, employed the same methodology based upon the same information that Mr. Petro and Mr. Lindsay used here.

Motorola's last argument takes issue with Mr. Lindsday's conclusion that a 7% royalty is reasonable. In substance, Motorola disagrees with Mr. Lindsay's reliance on certain settlement and license agreements. Motorola contends that Plaintiffs' license agreement with Itronix/General Dynamics is the "most comparable license agreement in the record" (Dkt. 187 at 9), and Lindsay's failure to consider it *exclusively* renders his testimony inadmissible. Mr. Lindsay's election and weighting of facts and evidence is a matter for cross examination not exclusion under *Daubert*.

## II. SUMMARY OF MR. LINDSAY'S METHODOLOGY AND OPINIONS

Mr. Lindsay conducted a detailed analysis of the fifteen *Georgia-Pacific* factors and considered "the nature and importance of the patented technology as it relates to the accused products, the extent of Motorola Mobility's infringing use of the patented technology, and the benefits received by Motorola Mobility from that infringing use." Dkt. 178 at Exh. A (Lindsay Expert Report) at ¶ 12.

Mr. Lindsay considered Plaintiffs' licensing history and their thirteen licenses with other companies, including Ennova and Itronix (Motorola erroneously suggests otherwise). *See id*. at ¶¶ 35-79 and Fig. 1 (reproduced below). Based upon the comparability of the Plaintiffs' agreements the bare patent license Motorola would have negotiated with them, and several licensees acknowledging the validity of Plaintiffs' patents, Mr. Lindsay opined that the $3/unit or 7% running royalty was "consistent with the conditions of a hypothetical negotiation between the parties in this case. *Id*. at ¶ 135. He summarized Plaintiffs' agreements in the table at Exhibit C (reproduced from his report).

In his analysis, he noted Plaintiffs' preference for a running royalty and recognized that "a number of the . . . agreements were based on the value of products that were stand-alone keyboards, and not products where the keyboard was only one component of a multi-component device." *Id*. at ¶ 79. Acknowledging the significance of this fact, Mr. Lindsay properly undertook an apportionment analysis under *Georgia-Pacific* Factor 13 (*id*. at ¶¶ 122-129) to "isolate[] the portion of handset value that is attributable to the illuminated keybaord at issue." *Id*. at ¶ 123. In other words, Mr. Lindsay did exactly the opposite of what Motorola accuses in its motion. He detailed his analysis as "rather than applying a royalty of 7% to the total average handset value of $162.02 . . ., I considered the application of 7% to only the portion of the handset value attributable to the illuminated keyboard component. *Id*. at ¶ 136.

To apportion the royalty base to reflect the value of the patented invention, Mr. Lindsay considered the "cost of the allegedly infringing keyboard component relative to the overall manufacturing cost of the handset" (the bill or material or BOM cost) and the opinions of Justin Petro and Prof. Neikirk who identified the keyboard component of the accused handsets that practice the '872 patent and quantified the portion of the keyboard that reflects the '872 invention as a portion of the commercial product. *Id*. at ¶ 126-129.

Starting with the BOM, Mr. Lindsay analyzed the keyboard component as a portion of total cost of the handset, concluding, "the value of the accused illuminated keyboard based on cost information alone carries the risk of understating the value and importance of the technology at issue in this case." Dkt. 178 at *Exh*. A (Lindsay Report) at ¶ 127. Mr. Petro also undertook a BOM analysis, which formed a baseline for his apportionment analysis, and noted, "[w]hen a feature is particularly innovative, for example, or identifies a brand or product intrinsically, then

its value to the consumer, as well as to the manufacturer, may exceed its relative value to build."
Dkt. 180, Exhibit 1 (Petro Expert Report) at 56.

Mr. Petro's analysis turned next to the facts showing what specifically drove consumer demand for the accused products vis-à-vis the '872 patent.  As an industrial designer, Mr. Petro testified about how he performed a feature analysis of the accused products, considering Motorola's survey data, and its marketing messages and touts that stress certain features and aspects of the accused products.  Motorola's Marketing Director, Brian Mehta, described the importance of marketing messages and touts at his deposition (Mehta Depo. at 38:18-39:14):

> Q. You mentioned something earlier, you described key features when we were talking about consistent messaging.  In lay terms, what is a key feature of a product?
>
> A. In marketing, we try to present the top three or four important or distinct or differentiating features about the product for consumers.
>
> Q. And the -- is the purpose of that to convey to the consumers the features that you think are going to drive sales or that are going to meet demand? What's the -- what's the dynamic that you're playing with that -- you know, in selecting those features?
>
> A. In general when we talk about key – key features, it is in effort when we are launching a new product to inform the consumer what are the -- what is the value proposition or why do they -- why would they want to buy the product.

Mr. Lindsay also considered Motorola's own licensing history, to the extent disclosed, including the Motorola/VTech license agreement that directly related to the RAZR keyboards at issue in this case.  Dkt. 178 at Exh. A (Lindsay Report) at ¶¶ 113-16.  Motorola produced the VTech agreement during discovery in this case, but it withheld production of its expert's (Michael Wagner) report in that case until after the close of discovery.  Consequently, Mr. Lindsay was not able to review Mr. Wagner's report until after he served his own expert report.  Both Plaintiffs' and Motorola's experts, Lindsay and Kindler, testified about the Wagner report and related materials at their respective depositions.

In his expert report, Mr. Wagner analyzed the value of the RAZR keypad relative to two Motorola patents. His analysis is strikingly similar in methodology and conclusion to the analyses Mr. Petro and Mr. Lindsay conducted. First, Mr. Wagner considered how the relative value of the keypad design (its thin style, iconic nature, brand value, etc.) impacted an appropriate reasonable royalty rate. Dkt. 180, Exhibit 5 (Wagner Expert Report) at ¶¶ 206-07, 256 ("ID/brand is the most important attribute at all tiers, eclipsing price, camera, music player, and video as the most important feature"). Mr. Petro undertook the same analysis and concluded, as did Wagner, that the keyboard of the RAZR family of handsets was the most compelling feature of the handset, was tied to the overal thinness of the device, and drove demand for the product. Dkt. 180, Exhibit 1 (Petro Expert Report) at 71-3 ("The largest contributor to the thin design was the RAZR's keypad innovation."). Summarizing his analysis, Mr. Petro stated:

> As I referenced earlier, the reach of the ID of the phone was immense. Motorola's brand choices, marketing campaigns, future phone roadmap, advertising, packaging, endorsements, and interface was influenced by the phone and in particular the keypad. And, while the RAZR had other compelling features (like a camera or high speed connectivity) — so did other phones and providers. No other provider had the RAZR's keypad though.

*Id*. at 75. Mr. Petro concluded that a "quantitative assessment of the value in the accused products that is attributable to the '872 patent is between 17% and 25%." *Id*. at 74.

With respect to this motion, the Wagner report is important for two reasons. One, it establishes that the methodologies done by Mr. Lindsay (and Mr. Petro) are appropriate and correct. Second, Mr. Lindsay's reliance upon the the Wagner report further solidifies that the royalty rate determined by Mr. Lindsay is reasonable and correct compared to the rate Wagner found appropriate for the same RAZR keypad technology (5% of total price).

Based upon all of this information, Lindsay concluded, "[a] royalty of $2.00 per infringing unit recognizes the contribution of the Plaintiffs' invention to Motorola Mobility's

accused devices, but also gives credit to Motorola Mobility for the additional contributions, business risks, costs, feautues, benefits, and other factors not covered by the patent at issue that impact the overal success of the accused products." Motorola's assertion that Mr. Lindsay failed to do these things is contradicted by the record.

### III. MR. LINSDAY'S OPINIONS ARE ADMISSIBLE

Motorola's three arguments fails because Lindsay's opinion is not based upon the EMVR, his apportionment analysis (and Mr. Petro's methodology) is accepted and was used by Motorola's expert, and his royalty rate is properly based upon comparable agreements.

**A.   Mr. Lindsay Did Not Apply EMVR.**

In an EMVR analysis, the revenue of an entire accused product serves as the royalty base. That is not what Mr. Lindsay did. In his opinion, the parties would have agreed to a running royalty structure.[2] Motorola does not challenge this aspect of Lindsay's opinion. The running royalty structure calls for determination of an appropriate rate base and rate. *Virnetx, Inc. v. Cisco Syss., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014).

The properly apportioned base represents the "smallest salable infringing unit with close relation to the claimed invention. *Id.* (citation omitted). In *LaserDynamics, Inc. v. Quanta Computer, Inc.*, the Federal Circuit emphasized the requirement to show a close relation to the claimed invention by tying consumer demand to the patented invention. 694 F.3d 51, 68-69 (Fed. Cir. 2012). Mr. Lindsay performed an apportionment analysis relying upon the expert opinions of Prof. Neikirk, who testified that the keyboard infringes the asserted claims of the

---

[2] Lindsay opined that a running royalty is consistent with Plaintiffs' other licenses and would have been preferable to a lump-sum if Motorola truly anticipated a drop in sales of its RAZR family of handsets due to the changing market. Exhibit A (Lindsay Depo.) at 39:4-40:13 (explaining why a lump-sum on the #1 selling handsets of all time would have been rejected and the parties would have agreed upon a running royalty if Motorola expected sales to decline).

'872 patent, and Justin Petro, who performed a detailed feature analysis to determine the portion of the accused handset value attributable to the '872 patent. Dkt. 180, Exh. 1 (Lindsay Report) at ¶¶ 31, 104-106, 108, 128, 130, and 137.  Based upon his own and Mr. Petro's analysis, Mr. Lindsay reduced the royalty base by applying a 17-25% apportionment factor to the average handset sales price to arrive at an apportioned base reflecting the value of the '872 patented features that drive demand for the accused products.  *Id.*

Contrary to Motorola's argument, Mr. Lindsay does not offer an opinion based upon total revenue or a royalty rate applied to total revenue.  Mr. Lindsay concludes that a reasonable royalty appropriate to compensate Plaintiffs for Motorola's infringement is $2.00 per unit sold, and his rate does not depend upon revenue generated from sales of infringing products.

To make its argument, Motorola converts Mr. Lindsay's per unit rate into a percentage of total revenue.  *See* Dkt. 187 at 3 n. 1 (characterizing its arithmetic).  But this illustration misses the point.  Of course a royalty payment can be converted into a percentage of revenue for a fixed number of units sold.  That mathematical proof reveals nothing.  If the volume of infringing units is fixed, any properly apportioned running royalty can be converted back into a percentage of total revenue in the same way a lump-sum may be converted into a per unit royalty rate.  Recharacterizing the mathematical proof as a percentage of revenue does not show that the original methodology used the EMVR.  Here, Mr. Lindsay arrived at his per unit rate after carefully and correctly performing the proper *Georgia-Pacific* royalty rate analysis and an apportioned royalty base as directed by the Federal Circuit.  *Virnetx, Inc. v. Cisco Syss., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014).

**B.    Mr. Lindsay's and Mr. Petro's Apportionment Methodology is Appropriate.**

Motorola's challenge contradicts its own expert's testimony and methodology.  First, Motorola errs in asserting that Mr. Petro apportioned the entire keyboard without regard to the

invention of the '872 patent. Mr. Petro stated clearly, "[b]ased upon my analysis, the information I have reviewed, discussions with the inventors and Professor Neikirk, in my opinion a quantitative assessment of the value in the accused products *that is attributable to the '872 patent* is between 17% and 25%." Dkt. 180 at Exhibit 1 (Petro Expert Report) at 74. While Ms. Kindler disagreed with Petro's 17-25% apportionment factor, she agreed that "the keypad assembly would be the closest measure to the smallest salable unit given that the 872 patent is embodied within the keypad assembly." Exhibit B (Kindler Depo.) at 208:8-18. Their disagreement as to the value of the keyboard is a matter for cross-examination.

Once Mr. Lindsay's royalty base accurately reflected the portion of value attributable to the '872 patent, he did not need to (nor should he have) adjusted the appropriate royalty rate. Dkt. 187 at 6. Indeed, it is precisely that arbitrary adjustment that the Federal Circuit warns against. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (criticizing expert for arbitrarily reducing royalty rate as a way to apportion).

Finally, the feature analysis that Mr. Petro performed is precisely what Mr. Wagner did for Motorola in the VTech case and the methodology Ms. Kindler acknowledged as "common" and appropriate in patent cases. *See, e.g.*, Lindsay Depo. at 183:22-185:7 (discussing Mr. Wagner's consideration of the RAZR "Industrial Design and Feature set" as Motorola described it in internal RAZR documents). At her deposition, Ms. Kindler testified that she merely "performed adjustments to Mr. Lindsay's apportionment." Exhibit B at 208:5-7.

**C.   Motorola's Disagreement with Mr. Lindsay's Royalty Rate is No Reason to Exclude His Testimony.**

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987).

Motorola's challenge is based upon a simple disagreement: Motorola contends that Plaintiffs' license with Itronix is "the most comparable license in the record." Dkt. 187 at 9. Premised on that contention, Motorola argues that Mr. Lindsay's 7% royalty rate is unsupported because he should not have relied upon Plaintiffs' *other* agreements. *Id*. at 9-10. In contrast, Motorola's expert applied the same methodology, gave more weight to the Itronix license, and concluded the appropriate royalty rate is 1%. As the chart attached as Exhibit C (Fig. 1 from Lindsay's Report) shows, Mr. Lindsay reasonably found that Plaintiffs' agreements establish a 7% rate for ongoing sales of embodying products. Mr. Lindsay afforded more weight to these other agreements because they include terms and reflect circumstances more comparable to the hypothetical negotiation in between Motorola and Plaintiffs. *Virnetx, Inc. v. Cisco Sys., Inc*., 767 F.3d 1308, 1330 (Fed. Cir. 2014) ("we have never required identity of circumstances; on the contrary, we have long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty") (quotations and citation omitted).

Lindsay explained in his report that the agreements he relied upon were more comparable because they were bare patent licenses, and several licensees acknowledged the patents were valid and enforceable (as Motorola's expert agreed Motorola would at the hypothetical negotiation). *See* Dkt. 178 at Exh. A (Lindsay Expert Report) at ¶ 77 (summarizing license terms). Mr. Lindsay explained that the Itronix agreement is the only agreement that would not provide the clearance required by Motorola. *Id*. at ¶ 139. The Itronix agreement included a restricted field of use (limited to rugged laptop computers) and did not grant a license for use in cellular handsets or any other product. *Id*. at ¶¶ 35-38, and 139. The non-restricted license Motorola would require at the hypothetical negotiation typically would command a higher rate than the Itronix agreement. *Id*. at ¶ 132.

Moreover, Lindsay recognized that these licenses were for stand-alone illuminated keyboards rather than a multi-component device. He properly isolated the portion of the handset attributable to the patent-practicing keyboard and recognized the downward pressure on royalty rate this factor effected. Exh. A, Lindsay Depo. at 78:9-79:14; 133:1-11; 201:12-202:15; Dkt. 178 at Exh. A, Lindsey Report at ¶¶ 135-138. Ultimately, Mr. Lindsay's rate is less than the $3.00 Plaintiffs received on past sales and less than 7% of the total handset value. *Id.* at ¶ 141.

Motorola's last point, regarding the distinction between licenses stemming from litigation, is another matter of disagreement on comparability. *Datatreasury Corp. v. Wells Fargo & Co.*, C.A. No. 2:06-CV-72 DF, 2010 WL 903259, at *2 (E.D.Tex. Mar. 4, 2010) ("Defendants' concerns about the reliability of litigation-related licenses are better directed to weight, not admissibility.").

In sum, Ms. Kindler and Mr. Lindsay conducted the same analysis but reached different conclusions. Their disagreement does not render Mr. Lindsay's opinions inadmissible.

## IV. CONCLUSION

Motorola's motion should be in all things denied because Mr. Lindsay's opinion is not based upon the EMVR, Mr. Lindsay's apportionment analysis (and the methodology Mr. Petro used in conducting his apportionment analysis) is accepted and was used by Motorola's own expert, and Mr. Lindsay's royalty rate is properly based upon comparable agreements. Therefore, Plaintiffs request that Motorola's motion to exclude be in all things denied.

Dated:  November 10, 2014						Respectfully submitted,

							Taylor Dunham and Rodriguez LLP
							301 Congress Ave., Suite 1050
							Austin, Texas  78701
							512.473.2257 Telephone
							512.478.4409 Facsimile

							By:	/s/ Cabrach J. Connor
								David E. Dunham
								State Bar No. 06227700
								Email:  ddunham@taylordunham.com
								Cabrach J. Connor
								State Bar No. 24036390
								Email:  cconnor@taylordunham.com
								Jennifer Tatum Lee
								Texas Bar No. 24046950
								Email:  jtatum@taylordunham.com

							Meyertons, Hood, Kivlin, Kowert & Goetzel, P.C.
							Eric B. Meyertons
							State Bar No. is 14004400
							Email: emeyertons@intprop.com
							Ryan Tyler Beard
							State Bar No. 24012264
							Email: rbeard@intprop.com
							Willem G. Schuurman
							State Bar No. 178552
							Email: bschuurman@intprop.com
							1120 South Capital of Texas Highway,
							Building 2, Suite 300
							Austin, Texas 78746
							512.853-8800 Telephone
							512.853.8801 Facsimile

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the following counsel of record are being served with a copy of this document via electronic mail on this 10th day of November, 2014:

Andrew R. Sommer
Email: asommer@winston.com
**WINSTON & STRAWN, LLP**
1700 K Street N.W.
Washington, D.C. 20006-3817
202.282.5000 (phone)
202.282.5100 (facsimile)

Jonathan E. Retsky
Email: jretsky@winston.com
James Winn
Email: jwinn@winston.com
Stephen Wurth
Email: swurth@winston.com
Kurt Mathas
Email: kmathas@winston.com
**WINSTON & STRAWN, LLP**
35 W. Wacker Drive
Chicago, IL 60601-9703
312.558.3791 (phone)
312.558.5700 (facsimile)

David Enzminger
Email: denzminger@winston.com
**WINSTON & STRAWN, LLP**
333 S. Grand Ave.
Los Angeles, CA 90071-1543
213.615.1780 (phone)
312.558.5700 (facsimile)

Phillip D. Price
Email: pprice@winston.com
**WINSTON & STRAWN, LLP**
1111 Louisiana, 25th Floor
Houston, TX 77002
713.651.2600 (phone)
713.651.2700 (facsimile)

Steve McConnico
Email: smcconnico@scottdoug.com
Paige Arnette Amstutz
Email: pamstutz@scottdoug.com
Steve Wingard
Email: swingard@scottdoug.com
**SCOTT, DOUGLASS & MCCONNICO, L.L.P.**
600 Congress Avenue, Suite 1500
Austin, Texas 78701
512.495.6300 (phone)
512.474.0731 (facsimile)

*COUNSEL FOR DEFENDANT MOTOROLA MOBILITY LLC*

/s/ Cabrach J. Connor
Cabrach J. Connor